## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD LAIRD** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | **NO. 23-3429** |
| | **:** | |
| **J. TERRA** *et al.* | **:** | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                    **October 11, 2024**

Persons supervising incarcerated persons must balance the safety of the facility's employees and other incarcerated persons while mindful of the incarcerated persons' physical and mental health during confinement.  Incarcerated persons placed in solitary confinement may face mental health struggles as now well documented in cases and commentary. We today address an incarcerated person's pro se claims following discovery against the officials managing his facility challenging the conditions of confinement during an extended term in solitary confinement allegedly for his own safety followed by an extended period of modified movement restrictions while in the general population.  The facility officials move for summary judgment.  But they did not support several of their theories with evidence. We scrutinized the record including affidavits from other incarcerated persons.  We grant judgment to the officials dismissing claims challenging the modified movement restrictions as well as some claims relating to conditions of solitary confinement.  But we also find genuine issues of material fact or a lack of support for the officials' arguments seeking judgment on the incarcerated person's pro se Eighth Amendment conditions of confinement and inadequate mental health care claims arising from his time in solitary confinement.  These issues must be resolved by our jury.

## I.   Undisputed Material Facts[1]

The Commonwealth detained Richard Laird, an individual serving a sentence for capital murder, at the State Correctional Institution at Phoenix from June or July 2020 until January 2024.[2]

### *Concerns for Mr. Laird's safety given his role in White Phoenix.*

Security staff at SCI Phoenix learned Mr. Laird founded a group of incarcerated white males called "White Phoenix."[3] White Phoenix was a fraternal organization of white, like-minded individuals who worked together to ensure the safety, security, and comfort of its members.[4] Mr. Laird served as the president of White Phoenix.[5] He acquired symbolic tattoos with the word "WHITE" tattooed on his right hand, "PHOENIX" tattooed on his left hand, and the depiction of a phoenix tattooed on his neck.[6]

White Phoenix generated security concerns; corrections officers believed other incarcerated individuals within the Facility posed a threat to Mr. Laird.[7] Non-party Lieutenant Joliff completed an "802 Report" assigning Mr. Laird administrative custody status because alternate measures could not protect him from the threat.[8] The ranking corrections officer approved the report.[9] The Facility transferred Mr. Laird from general population to solitary confinement on August 8, 2022.[10] Mr. Laird's administrative custody status did not arise from misconduct.[11] Mr. Laird appealed his administrative custody status to then-Superintendent Sorber on August 10, 2022 without success.[12] Over the next several months he filed numerous requests to staff members seeking to return to general population, all of which were denied.[13]

### *Facility policies governing solitary confinement.*

A policy in place during Mr. Laird's solitary confinement required the Facility's Program Review Committee to review the status of incarcerated individuals in administrative custody every seven days for the first two months.[14] After the first sixty days, the Review Committee only had to

review the incarcerated individual's administrative custody status once every ninety days.[15] The policy required individuals in administrative custody to have weekly visits with their counselors.[16] A qualified psychologist or psychiatrist had to evaluate any individual who remained in administrative custody for more than thirty days, with additional evaluations to follow every ninety days.[17] The policy instructed prison officials to explore other specialized housing alternatives before placing mentally ill individuals on administrative custody status.[18] "If safety [could not] be reasonably assured in any status other than [administrative custody]," the policy required "appropriate mental health or medical services [to] be provided . . . ."[19]

### *Mr. Laird's experience in solitary confinement.*[20]

The Facility provided one psychological evaluation of Mr. Laird on October 25, 2022.[21] The Review Committee conducted numerous periodic reviews of his administrative custody status.[22] The Committee conducted Mr. Laird's first ninety-day review on November 9, 2022.[23] The Committee members agreed Mr. Laird should remain in solitary confinement while they awaited his possible placement into the Security Threat Group Management Unit.[24] The Committee conducted Mr. Laird's second ninety-day review on February 8, 2023.[25] The Committee members again agreed to keep Mr. Laird in solitary confinement pending determination of appropriate housing.[26] Mr. Laird spent 229 days in solitary confinement and rejoined the general population with modified movement restrictions on March 24, 2022.[27]

**General conditions.** The Facility's staff denied him Mr. Laird all of his personal belongings save for one pair of underwear during his first 137 days of solitary confinement.[28] He did not have access to his legal files or an address or telephone book for some period of time but the Review Committee granted him access to one box of legal files in December 2022.[29] Mr. Laird underwent invasive strip searches multiple times each day.[30] Prison staff placed him in restraints

3

each time he exited his cell.[31] Mr. Laird's cell contained a frosted window and no mirror.[32] The frosted window and lack of mirror caused Mr. Laird to experience "sensory deprivation."[33] A light was on in the cell twenty-four hours a day.[34] Mr. Laird could hear screaming and howling from other individuals being tortured or beaten by guards.[35] Mr. Laird's cell was freezing cold and he did not have a blanket or pillow.[36] Facility staff allowed Mr. Laird to shower three times a week in flea-infested sewer water.[37]

Facility staff fed Mr. Laird a "starvation diet."[38] The trays did not contain enough food for an adult.[39] Facility staff in the restricted housing unit let food trays sit out so the food became cold.[40] Mr. Laird weighed 258 pounds when he entered solitary confinement and 223 pounds when he rejoined the general population.[41] Facility officials permitted him to exercise one hour a day five days a week in a small cage but did not allow him to use exercise equipment.[42] Mr. Laird lost muscle mass as a result.[43]

**Medical concerns.**  Mr. Laird suffered from depression, anxiety, and suicidal ideations while in solitary confinement.[44] Seeking mental health treatment was "all but impossible."[45] Mr. Laird witnessed prison guards spray other incarcerated individuals who asked for mental health treatment with tear gas and drag them to cells for psychiatric observation where they were stripped naked on full display behind clear glass doors until they were "ready to go back to . . . solitary."[46] Mr. Laird did not want to endure that treatment to seek out mental health assistance.[47] Mr. Laird still suffers from severe depression.[48]

Mr. Laird also experienced physical ailments apart from his mental health struggles. For instance, the stress and anxiety of solitary confinement caused intestinal issues.[49] Showering in dirty water caused Mr. Laird to suffer from toenail infections which continue to this day.[50] Mr. Laird did not seek medical assistance for his infected toenails.[51]

4

### *Mr. Laird's experience under modified movement restrictions.*

Mr. Laird left solitary confinement after 229 days.[52] The earlier-considered Security Threat Group Management Unit no longer remained an option, so Mr. Laird returned to the P Unit (the general population unit for capital case individuals) with modified movement restrictions.[53] The modified movement restrictions required a corrections officer to escort Mr. Laird during off-unit activities, including religious services.[54] The restrictions required Mr. Laird to sit apart from other church attendees.[55] Staff members harassed him when he attempted to go to Catholic Mass, discouraged him from attending Mass, and pulled him from services.[56] Mr. Laird requested the restrictions be lifted but Superintendent Terra denied his requests.[57]

### *Mr. Laird sues state actors challenging his solitary confinement.*

Mr. Laird sued various Facility officials alleging constitutional violations related to his solitary confinement and modified movement restrictions.[58] We dismissed Mr. Laird's claims several times without prejudice.[59] In our last Order we dismissed with prejudice Mr. Laird's claims against Secretary Dr. Laurel Harry and his First, Eighth, and Fourteenth Amendment claims against Deputy Superintendents Nathan Wynder and Charles Hensley concerning Mr. Laird's modified movement restrictions.[60] We allowed Mr. Laird to amend his Complaint to state claims under the Eighth and Fourteenth Amendment against Superintendent Joseph Terra, Deputy Superintendents Wynder and Hensley, and the Review Committee Members concerning his solitary confinement.[61] We instructed Mr. Laird he would have to plead deprivations other than his placement in solitary confinement to state a conditions of confinement claim or procedural due process claim.[62] We allowed Mr. Laird to amend his Complaint to state claims under the First, Eighth, and Fourteenth Amendment against Superintendent Terra and the Review Committee Members concerning the modified movement restrictions.[63] We instructed Mr. Laird he would have to plead facts explaining

how having an escort in prison violated his free exercise, access to courts, conditions of confinement, or procedural due process rights.[64]

We afforded the parties several months of extended discovery mindful of Mr. Laird's incarcerated status. The Facility officials answered Mr. Laird's amended Complaint and the parties engaged in discovery. We granted Mr. Laird's request for appointed counsel from our Volunteer Lawyers Panel.  No attorney volunteered.

## II.    Analysis

The Facility officials now move for summary judgment.[65] Mr. Laird opposes summary judgment.[66]  We grant summary judgment to the officials on Mr. Laird's modified movement claims. We also grant summary judgment on many of his solitary confinement claims but not all.

We liberally construe the pro se second amended Complaint.[67] We break down his claims into two phases: during solitary confinement and then under modified movement restrictions. Arising from his time in solitary confinement Mr. Laird alleges Superintendent Terra, Deputy Superintendents Wynder and Hensley, and the Review Committee Members violated his right to be free from cruel and unusual punishment, his due process rights, and his right to access the courts while he spent time in solitary confinement.[68] Arising from the modified movement restrictions imposed after Mr. Laird returned to general population, he alleges Superintendent Terra violated his right to freedom of religion, his right not to be free from cruel and unusual punishment, his due process and equal protection rights, and his right to access the courts.[69] Mr. Laird also purports to state claims under Pennsylvania's official oppression act, a criminal statute, and the federal Crime Victim Rights Act, which does not contain a private cause of action, arising from his solitary confinement and modified movement restrictions.[70]

**A.  We grant in part and deny in part the Facility officials' Motion for summary judgment on Mr. Laird's claims arising from his solitary confinement.**

We deny the Facility officials' Motion for summary judgment on Mr. Laird's Eighth Amendment conditions of confinement claim. We grant in part and deny in part the Facility officials' Motion on Mr. Laird's Eighth Amendment inadequate medical care claim. We grant the Facility officials' Motion for summary judgment on Mr. Laird's Fourteenth Amendment procedural due process claim. The Facility officials do not move for summary judgment on several of Mr. Laird's claims arising from his time in solitary confinement, including his claim alleging denial of access to the courts and his claims under Pennsylvania's official oppression act and the federal Crime Victim Rights Act but we dismiss them recognizing our screening obligations under section 1915(e)(2)(B)(ii).

**1.  There is no genuine dispute the named Facility officials did not order Mr. Laird's placement into solitary confinement, but we must consider whether there is a basis for liability on the specific alleged deprivations.**

The Facility officials ask us to grant summary judgment because Mr. Laird has not established Superintendent Terra or Deputy Superintendents Wynder and Hensley personally ordered Mr. Laird be placed in administrative custody.[71] "In advancing any § 1983 claim against prison officials, a plaintiff may not rely solely on a *respondeat superior* theory of liability."[72] "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."[73] "Allegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity."[74] "Alternatively, a plaintiff seeking to show personal involvement for a supervisor may plead facts which show that the alleged constitutional violation is the result of a policy, practice, or custom put into effect by the supervisor."[75]

The Facility officials offer evidence persons other than themselves ordered Mr. Laird's placement into solitary confinement, including Mr. Laird's sworn testimony.[76] Mr. Laird disagrees with the characterization of his testimony, but there is no evidence establishing the Facility officials had anything to do with Mr. Laird's initial placement into administrative custody.[77] Mr. Laird "cannot avert summary judgment with speculation or by resting on the allegations in their pleadings."[78] The record further indicates the responsible officials made the decision under a policy permitting at-risk individuals to be placed into administrative custody absent alternate protective measures.[79]

We agree the record establishes the Facility officials were not personally involved with Mr. Laird's initial placement. But this does not end our analysis given the specific deprivations Mr. Laird now pleads he experienced during his time in solitary confinement.[80] We must consider whether there is evidence Superintendent Terra, Deputy Superintendent Wynder, or Deputy Superintendent Hensley had personal or supervisory involvement with the deprivations Mr. Laird now alleges in detail.

> **2. We deny summary judgment on Mr. Laird's conditions of confinement claim arising from solitary confinement but grant in part and deny in part summary judgment on Mr. Laird's inadequate medical care claim arising from solitary confinement.**

Mr. Laird alleges his conditions of solitary confinement violated the Eighth Amendment. "The Eighth Amendment 'prohibits any punishment which violates civilized standards and concepts of humanity and decency.'"[81] "The Supreme Court has interpreted this prohibition as 'impos[ing] affirmative duties on prison officials "to provide humane conditions of confinement."'"[82] "[W]hen the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety."[83] "To sufficiently allege prison officials violated his Eighth

Amendment rights by imposing inhumane conditions," Mr. Laird must "allege facts showing (1) the deprivation he endured was 'sufficiently serious,' and (2) the prison officials had 'a sufficiently culpable state of mind.'"[84] "[T]o withstand the government's motion for summary judgment, [Mr. Laird] must . . . raise[] genuine issues of material fact that the alleged deprivations were sufficiently serious and that the prison officials in question acted with deliberate indifference."[85]

Mr. Laird's allegations about the conditions in solitary confinement can be grouped into two buckets: claims challenging general conditions of confinement and claims challenging inadequate medical care.

###### i. The Facility officials do not demonstrate Mr. Laird's Eighth Amendment claim concerning the general conditions of confinement fails as a matter of law.

We employ a "totality of the circumstances" approach in deciding whether the Facility officials deprived Mr. Laird of "the minimal civilized measure of life's necessities."[86] Mr. Laird alleges he did not have access to his personal belongings save one pair of underwear for the first 137 days of solitary confinement, underwent multiple strip searches each day, and wore restraints each time he left his cell. His cell had a frosted window and no mirror. His cell was cold, and he did not have a blanket or pillows. A light was on twenty-four hours a day. Mr. Laird showered in dirty sewer water infested with fleas. He did not receive enough food and could only exercise in a small cage without equipment, resulting in weight loss and reduced muscle mass. The record contains evidence to support these allegations: Mr. Laird offers affidavits from four incarcerated individuals who swear they experienced similar conditions during their time in solitary confinement and he testified about several of these conditions during his deposition.[87]

The Facility officials surprisingly do not address their personal involvement with these conditions. Nor do they address many of the challenged conditions. The Facility officials instead

ask for summary judgment for the entirety of the Eighth Amendment claim but do not mention Mr. Laird's allegations concerning his personal belongings, strip searches, lack of reflective surfaces in the cell, twenty-four-hour lights, and insufficient food and exercise. They concede Mr. Laird's allegations concerning the dirty showers and cold temperatures but argue these claims must fail as a matter of law because "the Constitution does not mandate comfortable prisons."[88] We remind the Facility officials "[i]t is not the responsibility of the court to 'comb the record in search of disputed facts.'"[89] "As our Court of Appeals has emphasized, '[j]udges are not like pigs, hunting for truffles buried in briefs.'"[90]

As to the conditions the Facility officials *do* address – the dirty showers and cold temperatures –the nature of the conditions does not preclude a finding of "objectively, sufficiently serious" deprivations in violation of the Eighth Amendment. Our Supreme Court instructs "***[s]ome*** conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone . . . when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets."[91]

And our Court of Appeals cautions the trier of fact should often be the one who determines whether cell temperature combined with "the failure of prison officials to ameliorate the cold temperatures creates a sufficiently serious deprivation of the human need of adequate shelter to state a claim under the Eighth Amendment . . . ."[92] Mindful of this guidance from the Supreme Court and our Court of Appeals weighing against summary judgment and the Facility officials' decision to not address the majority of Mr. Laird's challenged conditions during solitary confinement, we deny summary judgment on the conditions of solitary confinement claim. Mr.

Laird's conditions of confinement claim arising from his time in solitary confinement must proceed to the fact finder.

> ii. **With the exception of Mr. Laird's allegations related to his infected toenails, the Facility officials do not demonstrate Mr. Laird's Eighth Amendment claim concerning inadequate medical care cannot proceed as a matter of law.**

Mr. Laird also pleads conditions of confinement related to inadequate medical care. There is "no significant distinction between claims alleging inadequate medical care and those alleging inadequate 'conditions of confinement.'"[93] The same deliberate indifference standard applies to both types of claims.[94] "We draw no distinction between psychiatric and medical care for [E]ighth [A]mendment purposes."[95] Our Court of Appeals instructs "psychological or psychiatric care at a jail is constitutionally inadequate if inmates with serious mental illnesses are effectively prevented from being diagnosed and treated by qualified professionals."[96]

Mr. Laird alleges physical ailments during his solitary confinement including weight loss, intestinal issues, and infected toenails. He suffered from depression, anxiety, and suicidal thoughts while in solitary confinement, but seeking mental health treatment was impossible. Mr. Laird continues to suffer severe depression and his infected toenails still cause him problems. Mr. Laird confirmed his medical issues during his deposition.[97]

The Facility officials do not offer contrary evidence to rebut Mr. Laird's claims about his health. Although the Facility officials produced hundreds of pages of medical records in discovery, they did not attach these medical records to establish the absence of a genuine issue of material fact.[98] They instead focus on whether Mr. Laird reported his medical conditions. The Facility officials do not address their personal involvement (or lack thereof) in Mr. Laird's allegedly inadequate medical care but argue because Mr. Laird did not report his medical conditions he cannot as a matter of law attribute those conditions to the Facility officials.[99] We agree in part.

### *We dismiss the infected toenails claim.*

There is no dispute Mr. Laird never reported his infected toenails.[100] Mr. Laird cannot prevail on this claim as a matter of law. Even if the shower water posed a substantial risk of serious harm Mr. Laird cannot prove the Facility officials knew of and disregarded this risk if he never reported the podiatric problems the water created.[101] We grant summary judgment for the officials on the infected toenails claim. But this reasoning does not extend to Mr. Laird's mental health concerns.

### *Mr. Laird may proceed on the mental health claim.*

The parties disagree whether Mr. Laird reported his depression, anxiety, suicidal thoughts, and intestinal issues/weight loss possibly attributable to his mental health. The Facility officials claim Mr. Laird did not report his mental health issues during his stay in solitary confinement.[102] Mr. Laird relies on two pieces of evidence to establish he notified the Facility officials about the negative impact of solitary confinement: a March 5, 2023 request to Superintendent Terra, and a letter Mr. Laird wrote to Ms. Hydro, a psychologist, on December 13, 2022.[103] We find it unnecessary to decide if these communications demonstrate the Facility officials' personal involvement with Mr. Laird's inadequate mental health care. Any failure on Mr. Laird's part to seek mental health treatment is seemingly attributable to the Facility officials' failure to implement certain policies in solitary confinement.

Mr. Laird may state an Eighth Amendment claim against a supervisor based on policies or practices if he alleges that the supervisors "knew or were aware of and disregarded an excessive risk to the [his] health or safety[.]"[104] Under our Court of Appeals's guidance in *Beers-Capitol v. Whetzel*, Mr. Laird must identify a specific policy or practice that the supervisor failed to employ and show: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment

injury; (2) the supervisor was aware of the unreasonable risk; (3) the supervisor was indifferent to that risk; and (4) injury resulted from the policy or practice.[105]

The Facility had a policy pertaining to incarcerated individuals placed into administrative custody titled DC-ADA 802.[106] The Facility officials placed Mr. Laird into administrative custody under section 1.B.1a, which provides for placement in a Security Level 5 housing unit if an individual "is in danger from some person(s) in the facility and cannot be protected by alternate measures . . . ."[107] The Facility's policy (at section 1.B.8) provides if the individual

> has a mental illness\* *or significant medical illness* the **Shift Commander or PCRNP** should explore the feasibility of placing him/her into a Secure Residential Treatment Unit (SRTU), Residential Treatment (RTU), SNU, **POC, or other specialized housing** as an alternative, as long as the [individual's] safety, *the safety of others, or the safety of the facility* is not jeopardized. <u>If safety cannot be reasonably assured in any status other than AC, then appropriate mental health *or medical* services must be provided while the [individual] remains in AC status.</u>[108]

The asterisk after "mental illness" cites to a footnote containing the text "5-ACI-4B-31."[109] We suspect 5-ACI-4B-31 contains the definition of "mental illness" but we cannot say for certain as the Facility officials address neither the policy nor the asterisk.

Starting with a discussion of whether the Facility officials failed to employ this policy, we consider the four-part test our Court of Appeals applied in *Beers-Capitol* to determine whether the Facility officials are entitled to summary judgment on a supervisory liability theory of inadequate medical care.

**Did the Facility officials employ section 1.B.8 of policy DC-ADA 802?** We first consider whether this provision of the policy applied to Mr. Laird. We find there is a genuine issue of material fact as to whether Mr. Laird has a mental illness which would have required prison officials to explore specialized housing as an alternative to solitary confinement, and, if not, to provide him with mental health services. Prison officials assigned Mr. Laird administrative custody

status while awaiting placement into the Security Threat Group Management Unit.[110] If he is an individual with a mental illness, prison officials (including the Facility officials) were required to provide him with mental health care during his time in solitary confinement. Mr. Laird alleges he had a B-Code housing status, which denotes treatment for mental health issues within the Department of Corrections.[111] The Facility officials do not address Mr. Laird's mental health status in their Motion beyond their argument he did not report his depression and suicidal thoughts in solitary confinement.

We lack evidence suggesting the policy did not apply to Mr. Laird. We further assume the Facility officials failed to employ the policy requiring mental health care for mentally ill individuals living in solitary confinement. Mr. Laird suggests the officials did not employ the policy. He pleads he did not ask for mental health treatment because other individuals who sought treatment were sprayed with tear gas, placed in restraints, and dragged to psychiatric observation cells where they were stripped naked on full view for everyone to see. Mr. Laird's deposition testimony and the affidavits of the other individuals support his allegations.[112]

The Facility officials neither refute these allegations with their own evidence nor point to portions of the record establishing a lack of genuine issue of material fact.[113] They simply argue Mr. Laird did not report his depression or suicidal thoughts. But the policy does not say mental health care need only be provided to mentally ill individuals *who seek treatment*. It says mental health care must be provided to mentally ill individuals who remain in administrative custody. We cannot find, based on the record before us, the Facility officials employed the policy requiring mental health care for mentally ill individuals in solitary confinement. It seems they did not.

Even so, "[a] violation of an internal prison policy does not automatically rise to the level of a constitutional violation."[114] We must assess whether there is an issue of triable fact concerning

whether Superintendent Terra or Deputy Superintendents Wynder or Hensley were deliberately indifferent to a substantial risk to Mr. Laird's constitutional rights.

**Did the existing policy or practice create an unreasonable risk of Eighth Amendment injury?** The applicable practice here is the correctional officers' practice of punishing individuals who asked for mental health treatment by spraying them with tear gas, stripping them naked, and placing them in psychiatric observation cells. We look to decisions by our colleagues and our Court of Appeals to assess whether this created an unreasonable risk of Eighth Amendment injury.

Our Court of Appeals held in *Williams v. Secretary Pennsylvania Department of Corrections* last month "individuals with a *known* history of *serious* mental illness have a clearly established right not to be subjected to prolonged, *indefinite* solitary confinement – *without penological justification – by an official who was aware of that history and the risks that solitary confinement pose to someone with those serious health conditions.*"[115] We cannot decide based upon the record before us whether Mr. Laird's preexisting mental illness was "serious," and we acknowledge Mr. Laird spent 229 days in solitary confinement as compared to Mr. Williams's twenty-six years.[116] But Mr. Laird pleads numerous times he did not know how long he would remain in solitary confinement and the Facility officials told him it would be "forever."[117] And his allegations go beyond the amount of time he spent in solitary confinement; he also alleges an inability to seek mental health treatment.

Our Court of Appeals examined the lack of mental health treatment for incarcerated persons seven years ago in *Palakovic v. Wetzel*.[118] The incarcerated individual who suffered from serious mental health issues informed prison staff of his earlier suicide attempts and self-injury and the prison placed him on the mental health roster.[119] He received minimal mental health treatment such as ineffective medication and three visits from psychology staff, but the facility denied his request

for counseling from a psychiatrist.[120] The facility had a policy expressly prohibiting medical personnel from speaking with mentally ill individuals in solitary confinement for more than one or two minutes at a time through steel doors.[121] The incarcerated Mr. Palakovic committed suicide.[122] His parents sued prison officials in their supervisory capacity and medical personnel alleging the prison's systematic deficiencies punished the mentally ill rather than treating them.[123] The facility did not have a program to screen and evaluate individuals in need of mental healthcare, which caused officials to understate and ignore Mr. Palakovic's need for mental health care during his confinement.[124] Our Court of Appeals held the district court erred in dismissing the Palakovics' claims against the facility officials responsible for the mental healthcare treatment policies.[125] We note the differences in Mr. Laird's case. Mr. Laird did not commit suicide. He did not expressly request mental health treatment. But the policies and practices alleged here are sufficiently similar to the policies and practices in *Palakovic* for us to find an unreasonable risk of Eighth Amendment injury.

**_Were the Facility officials deliberately indifferent to the unreasonable risk?_** We finally consider whether Facility officials knew, and were indifferent to, the corrections officers' practices creating an excessive risk to Mr. Laird's health or safety. Our Court of Appeals instructs Mr. Laird may establish this element by showing the supervisor failed to adequately respond to a pattern of past occurrences of injuries like his own.[126] He can alternatively show the risk of harm was so great and so obvious the facility officials' failure to respond alone supports a finding of deliberate indifference.[127]

We again look to the guidance of our Court of Appeals in *Palakovic*. In analyzing the Palakovics' conditions of confinement claim our Court of Appeals noted the prison diagnosed Mr. Palakovic "with an array of serious mental health issues and placed him on a mental health roster,

making it quite reasonable to infer that prison officials had (or should have had) knowledge of those diagnoses."[128] Our Court of Appeals also noted the Palakovics alleged the prison officials knew the conditions of solitary confinement could cause severe psychological harm and exacerbate pre-existing mental health problems and were aware of suicides and instances of self-harm which occurred just before Mr. Palakovic's confinement.[129] The Court also examined these allegations with respect to Mr. Palakovic's inadequate medical care claim.[130] Our Court of Appeals held the district court erred in dismissing both claims.[131]

We address a similar situation. Our Court of Appeals in *Palakovic* reviewed a motion to dismiss, not a motion for summary judgment, and Mr. Laird did not commit suicide like the individual in *Palakovic*. But we still find the analysis instructive. Mr. Laird alleges the Facility officials knew of his mental health history because he had a B-Code housing status.[132] He alleges the Facility officials were seasoned corrections officers who were well aware of the negative effects of solitary confinement.[133] Mr. Laird testified about how guards punished individuals in solitary confinement who asked for mental health treatment. He submitted affidavits of other individuals swearing similar facts. He also attached Superintendent Terra's response to one of his appeals stating Mr. Laird was "granted numerous privileges . . . ***to minimize the effects of long-term Administrative Custody status.***"[134]

We acknowledge Mr. Laird's evidence is limited. But he still presents sufficient evidence to raise a genuine question of fact concerning his inability to obtain mental health treatment and the Facility officials' knowledge he faced an excessive risk to his mental health. The Facility officials, by contrast, offer no evidence in support of their Motion for summary judgment such as medical records establishing Mr. Laird had no mental health issues or evidence Mr. Laird did in fact receive mental health treatment. They do not attempt to rebut Mr. Laird's factual allegations

concerning his mental health history or the practices of the prison guards in solitary confinement. They rely solely on the legal argument Mr. Laird cannot establish deliberate indifference because he did not report his adverse health effects. We cannot grant judgment based on the record provided by the Facility officials. A jury will decide this claim. We deny the Facility officials' Motion for summary judgment on Mr. Laird's claim of inadequate medical care arising from his time in solitary confinement.

### 3. We grant summary judgment to the officials on Mr. Laird's procedural due process claim arising from his solitary confinement.

Mr. Laird alleges the Facility officials violated his due process rights because he had a liberty interest in not being unnecessarily confined to solitary confinement.[135] An incarcerated person alleging a procedural due process claim must plead prison officials deprived him or her of a protected liberty or property interest and provided a "constitutionally deficient" procedure through which to challenge the deprivation.[136] An incarcerated person has a liberty interest in remaining free from an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."[137] We must consider "(1) the amount of time spent in [solitary confinement]; and (2) whether the conditions of [solitary confinement] were significantly more restrictive than those imposed on other inmates."[138] If "a liberty interest . . . has been adversely affected by administrative segregation . . . the prison meets its due process obligations if it provides meaningful, periodic reviews of the prisoner's placement in segregation."[139]

As we detailed in our January 31, 2024 Order, Mr. Laird's placement in solitary confinement for 229 days is insufficient, without more, to allege a protected liberty interest.[140] Mr. Laird's second amended Complaint contains additional pleadings distinguishing life in solitary confinement compared to life in general population. These alleged facts are the same as the facts supporting Mr. Laird's Eighth Amendment conditions of confinement claim.[141] Mr. Laird pleads

individuals in general population had proper meals, clothing, television, in-cell radio, access to their legal files and telephone or address book, proper exercise equipment, the ability to leave their cell without strip searches or restraints, visitation rights, telephone rights, and daily showers in stalls not flooded with sewer water and insects.[142] Mr. Laird did not have these privileges in solitary confinement. He supports these allegations with affidavits from other incarcerated individuals who confirm the conditions of solitary confinement.[143] He also offers periodic reviews and other requests where he asked for various personal belongings he did not have access to.[144]

The Facility officials seemingly concede Mr. Laird alleges a liberty interest because they do not address the conditions in solitary confinement as compared to the general population.[145] They also seemingly concede Superintendent Terra and Deputy Superintendent Hensley, at least, were personally involved with the review process implicating Mr. Laird's due process rights.[146]

The Facility officials instead move for summary judgment on the basis Mr. Laird "was afforded meaningful periodic reviews and, thus, adequate due process."[147] Much of their evidence on this point is unpersuasive. For instance, the Facility officials claim Mr. Laird received periodic reviews every seven days during his first two months in solitary confinement.[148] In support of this statement they cite their own policies and a declaration by Superintendent Terra.[149] But the periodic reviews they attach to their Statement of Undisputed Material Facts show during the first two months of solitary confinement Mr. Laird only received periodic reviews on August 17, 2022, August 24, 2022, and September 14, 2022.[150] Following the September review he did not have another review until December.[151] According to the Facility's policies, Mr. Laird should have received approximately eight reviews during his first two months in solitary confinement.

Some of the Facility officials' evidence does support their assertions. For example, there is record evidence Mr. Laird timely appealed his placement into administrative status, which then-

Superintendent Sorber denied for Mr. Laird's safety.[152] There is also record evidence the Facility officials conducted ninety-day reviews on November 9, 2022 and February 8, 2023.[153] And although Mr. Laird did not receive as many periodic reviews during the first two months as the Facility officials claim, he did receive semi-regular periodic reviews throughout the duration of his stay in solitary confinement.[154]

But the frequency of periodic reviews during Mr. Laird's first two months of solitary confinement is not a material fact because "the failure of prison officials to follow DOC policy does not, in and of itself, result in a violation of due process."[155] The question is instead whether the reviews Mr. Laird **did** receive afforded him the opportunity to be heard required under the Fourteenth Amendment. We consider Mr. Laird's initial appeal into administrative custody, the periodic reviews conducted during his time in solitary confinement, the two ninety-day reviews, and the requests Mr. Laird submitted outside of the review process.

We follow the guidance of our Court of Appeals in *Shoats v. Horn*.[156] The incarcerated individual in *Shoats* alleged a violation of his due process rights arising from solitary confinement.[157] Our Court of Appeals considered the process afforded to him. Shortly after his transfer into administrative custody, Mr. Shoats presented a statement to the review committee concerning his placement. Our Court of Appeals recited our Supreme Court's instruction from *Hewitt v. Helms*, "[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose . . . ."[158]

Apart from the initial appeal, Mr. Shoats also received committee reviews every thirty days, some of which he attended. He "raised and discussed various issues at these committee sessions"

and "complained about the denial of his release into the general population."[159] The prison officials advised Mr. Shoats of their reasons for keeping him in administrative custody, but he did not offer "any factual data to counter the prison's rationale for holding him."[160] The prison superintendent completed formal reports for any individual confined in administrative custody for ninety days.[161] The regional deputy commissioner reviewed the ninety-day reports to determine if further action was necessary.[162] Our Court of Appeals found "the Pennsylvania procedures clearly comply with due process requirements" and upheld summary judgment on behalf of the prison officials.[163]

The facts before us are similar. Mr. Laird received notice the prison was placing him in administrative custody on August 8, 2022 and he appealed the decision two days later on August 10, 2022.[164] Like Mr. Shoats, Mr. Laird "had the opportunity to have [his] version reported as part of the record[.]" Then-Superintendent Sorber denied his initial appeal for safety reasons.[165] We find Mr. Laird received the "informal, nonadversary review" satisfying due process requirements at the initial appeal stage.[166]

Following the initial appeal Mr. Laird received a number of periodic reviews and two ninety-day reviews.[167] In his opposition to summary judgment Mr. Laird argues the reviews were often held in absentia, meaning he had no input, and even when he was allowed to attend the review meetings, they were rushed and perfunctory.[168] The record shows Mr. Laird attended three out of eight of the periodic reviews and both of the ninety-day reviews.[169] When he attended the reviews Mr. Laird had the opportunity to make requests and discuss other issues with the Review Committee.[170] It is unclear from the record whether Mr. Laird simply declined to attend the meetings held in absentia or whether he did not have the opportunity to attend them. It appears the meetings held in absentia were perfunctory in nature – often limited to remarks such as "Remain AC status" or "Remain AC Pending review."[171] Yet we find this does not rise to the level of a due

process violation given Mr. Laird was permitted to attend and share his personal views at a number of reviews.[172]

We also consider Mr. Laird's appeals of the Review Committee's decision to keep him in solitary confinement and the requests Mr. Laird submitted to staff members outside of the review process.[173] Most of the appeals and requests repeat the same sentiments: Mr. Laird did not have access to his personal property, he did not have misconduct reports on his record, he did not fear the threats against him, and he wished to return to general population. Mr. Laird received written responses (some more detailed than others) both to his appeals and many of his other requests.[174] We are again guided by our Court of Appeals in *Shoats*. Like Mr. Shoats, Mr. Laird frequently complained about his placement in solitary confinement. The Facility officials denied his return to general population because they believed he was still at risk. Mr. Laird did not offer any favorable factual data to counter the reasons for his continued placement in solitary confinement. Without any evidence the Facility officials "failed to consider favorable information" we cannot conclude Mr. Laird "was denied the opportunity to respond or be heard[.]"[175]

Mr. Laird received adequate due process during his continued placement in solitary confinement. We grant the Facility officials' Motion for summary judgment on Mr. Laird's due process claim arising from his time in solitary confinement.

### 4. We dismiss Mr. Laird's claim alleging denial of his right to access the courts while in solitary confinement under section 1915(e)(2)(B)(ii).

Mr. Laird alleges he did not have access to his legal files for at least the first 137 days of solitary confinement.[176] We liberally construe Mr. Laird's second amended Complaint because he is proceeding pro se and interpret this allegation as a denial of the right to access the courts under the First Amendment.[177] The Facility officials do not move for summary judgment on this claim. Normally we would not decide the merits of claims in the absence of a motion for summary

judgment.[178] But Congress in section 1915(e)(2)(B)(ii) requires we dismiss a pro se individual's action at any time if it "fails to state a claim on which relief may be granted[.]"[179]

To state a claim for denial of his right to access the courts Mr. Laird must allege (1) the person who committed the conduct complained of was acting under color of state law; and (2) the conduct deprived him of right of access to the courts.[180] He must also "allege actual injury, such as the loss or rejection of a legal claim."[181]

Mr. Laird does not show his lack of access to legal materials for 137 days in solitary confinement resulted in the loss or rejection of a legal claim: he rests his allegations on the mere denial of access.[182] We dismiss this claim under our section 1915 screening obligations.

### 5. We dismiss Mr. Laird's claims alleging violations of Pennsylvania's official oppression act and the federal Crime Victim Rights Act arising from his solitary confinement under 1915(e)(2)(B)(ii).

Mr. Laird also purports to state claims under Pennsylvania's official oppression act, a criminal statute, and the federal Crime Victim Rights Act, which does not contain a private cause of action, arising from his time in solitary confinement.[183] The Facility officials do not move for summary judgment on either claim.  But again Congress requires us to screen these claims for failure to state a claim under section 1915(e)(2)(B)(ii).[184] Mr. Laird does not have a viable cause of action under these statutes which lack a private cause of action. We dismiss these claims for failure to state a claim.

### B. We grant in part and deny in part the Facility officials' Motion for summary judgment on Mr. Laird's claims arising from his modified movement restrictions.

Mr. Laird alleges a number of constitutional violations arising after his return to general population, at which time Superintendent Terra placed him under modified movement restrictions. He pleads the modified movement restrictions violated his right to religious freedom, his right not

to be subjected to cruel and unusual punishment, his due process rights, and his right to access the courts.[185] He states these claims under the Pennsylvania and the federal Constitution. We apply the same analysis to each claim.[186]Mr. Laird also pleads the officials violated Pennsylvania's official oppression act and the federal Crime Victim Rights Act arising from his modified movement restrictions.[187]

We grant summary judgment on Mr. Laird's First Amendment freedom of religion claim. We grant summary judgment on Mr. Laird's Fourteenth Amendment procedural due process and equal protection claims. The Facility officials do not move for summary judgment on Mr. Laird's Eighth Amendment conditions of confinement claim, his First Amendment denial of court access claim, or his claims under Pennsylvania's official oppression act and the federal Crime Victim Rights Act, but we dismiss these claims under section 1915(e)(2)(B)(ii).

## 1. We grant summary judgment on Mr. Laird's freedom of religion claim arising from his modified movement restrictions.

Mr. Laird claims the modified movement restrictions violated his right to religious freedom. Incarcerated persons "have a First Amendment right to the free exercise of their religions, but imprisonment necessarily results in some restrictions on the practice of religion."[188] "Limits on the free exercise of religion arise from valid penological objectives, including deterrence of crime, rehabilitation of prisoners, and institutional security."[189] "[R]egulations or policies that infringe upon an inmate's right to religious freedom need only pass a reasonableness test."[190] To determine the reasonableness of the regulation we apply the four-part test from our Supreme Court's holding in *Turner v. Safley* and ask "(1) whether the regulation bears a valid, rational connection to a legitimate and neutral government objective; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation

of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of ready alternatives."[191]

Mr. Laird alleges the modified movement restrictions required a corrections officer to escort him to religious services.[192] The Facility officials' evidence confirms this allegation.[193] Mr. Laird also alleges staff members harassed him when he attempted to go to Catholic Mass, discouraged him from attending Mass, and interrupted Mass by pulling him from services.[194] As evidentiary support he offers a grievance he filed about an incident in October 2023 where Corrections Officer Myles called Mr. Laird from Mass and yelled at him about "running [his] mouth[.]"[195] Corrections Officer Myles also threatened to send Mr. Laird back to his block.[196] Mr. Laird testified Facility staff prevented him from sitting with other people during Mass and prevented him from engaging with the congregation.[197] Mr. Laird alleges Superintendent Terra's ordered restrictions prevented him from attending a Catholic studies group and participating in Bible study but does not offer evidentiary support for these allegations.[198]

Superintendent Terra counters he did not have personal involvement with the harassment impacting Mr. Laird's ability to attend Mass and Mr. Laird cannot establish a First Amendment claim based on an inability to attend Catholic studies group.[199] We agree the record establishes Superintendent Terra might have had some personal involvement with the restrictions requiring Mr. Laird to have an escort in church but does not suggest Superintendent Terra had anything to do with the harassment Mr. Laird experienced while attending Mass. So we must determine whether the escort requirement alone interfered with Mr. Laird's ability to practice his religion.

We look to our Court of Appeals's opinion in *Robinson v. Wetzel*.[200] Our Court of Appeals applied the *Turner* test and affirmed Judge Carlson's Report and Recommendation finding no First Amendment violation occurred where an incarcerated individual could not view religious

programming and Bible studies on television but could receive visits from chaplains, receive communion, keep religious materials, and correspond with religious advisors.[201]

We apply the four *Turner* factors to the rule requiring a guard to escort Mr. Laird to religious services. Under the first factor we find Superintendent Terra imposed the restrictions with the legitimate objective of keeping Mr. Laird safe from harm from other incarcerated persons.[202] The second factor requires us to assess whether Superintendent Terra provided Mr. Laird with an alternative means of exercising his religious rights within the prison. The answer to this is plainly yes – the alternative was allowing Mr. Laird to attend church but requiring a prison guard to escort him. The third factor – the impact of the asserted right (here, the right to attend church unescorted) on the guards and other incarcerated individuals – also weighs in favor of summary judgment. Permitting Mr. Laird to attend church unescorted may have resulted in altercations between Mr. Laird and the other incarcerated individuals given Superintendent Terra's belief Mr. Laird still faced threats following his release from solitary confinement. And dealing with an altercation would require more guard manpower than a simple escort. Under the final factor we consider whether other alternatives existed. We can speculate other alternatives such as banning Mr. Laird from attending church services but allowing him to see a chaplain in his cell like the incarcerated plaintiff in *Robinson*, but this seems a more restrictive alternative than the limitations Superintendent Terra actually implemented. On balance we find the escort requirement did not encroach upon Mr. Laird's religious freedom.

There is nothing in the record supporting Mr. Laird's inability to attend Catholic studies group and/or Bible study, but even if there was, we do not find these limitations rise to the level of a religious freedom violation given he could still attend Mass.[203] We grant Superintendent Terra's Motion for summary judgment on Mr. Laird's freedom of religion claim.

**2. We grant summary judgment on Mr. Laird's procedural due process claim arising from his modified movement restrictions.**

Mr. Laird alleges Superintendent Terra violated his due process rights by implementing modified movement restrictions when Mr. Laird returned to general population as the restrictions were an undue hardship.[204] An incarcerated person alleging a procedural due process claim must plead facility officials deprived him or her of a protected liberty or property interest and provided a "constitutionally deficient" procedure through which to challenge the deprivation.[205] An incarcerated individual "neither [has] a constitutionally recognized liberty interest in a particular security classification nor constitutional right to be confined in a particular prison."[206] An incarcerated person has a liberty interest in remaining free from an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life.[207]

Mr. Laird pleads the modified movement restrictions required a security guard to escort him during off-unit activities, including religious services.[208] The constant escort made the other incarcerated persons view Mr. Laird in a negative light.[209] Mr. Laird alleges he could not visit the gym, the library, the law library, or the main yard.[210] He alleges he could not attend department offerings including Bible study, sporting activities, and soda and ice cream sales.[211] Mr. Laird's deposition testimony supports many of his allegations about the modified movement restrictions.[212]

Superintendent Terra (as with the due process claims arising from solitary confinement) seemingly concedes his personal involvement in Mr. Laird's modified movement restrictions. He also seemingly concedes the restrictions prevented Mr. Laird from attending off-unit activities unescorted but argues he is entitled to summary judgment because Mr. Laird received meaningful reviews concerning his modified movement status.[213]

We find it unnecessary to reach the issue of meaningful review.[214] Exercising the general principle cautioning us from deciding constitutional issues not essential to resolution of the case before us, we instead decide Mr. Laird's modified movement due process claim solely on the liberty interest element.[215]

To determine whether Mr. Laird had a liberty interest in the activities impacted by the modified movement restrictions, we look to several decisions where incarcerated individuals alleged a due process violation arising from restrictions imposed outside of solitary confinement. An incarcerated individual sued prison officials for a due process violation in *Alex v. Beard* when the superintendent denied the individual visitation with his daughter.[216] Judge Caldwell held the incarcerated plaintiff had no protected liberty interest in visitation rights because "the Constitution allows prison officials to impose reasonable restrictions upon visitation . . . ."[217] Judge Brody held the Due Process Clause confers no protected liberty interest in smoking or purchasing tobacco on incarcerated individuals in *Austin v. Lehman*.[218] Judge Linares held in *Caraballo v. Dudas* incarcerated individuals have no protected liberty interest in a particular prison job or prison classification level.[219] Judges outside of our Circuit have held "[t]he Constitution does not recognize an [incarcerated individual's] liberty interest in status and privileges."[220] For instance, Judge Rosenstengel found an incarcerated individual did not have a liberty interest when he complained about a demotion to C-grade, commissary and phone restrictions, and his lack of access to time outside his cell.[221] The Court of Appeals for the Seventh Circuit has similarly concluded incarcerated individuals have no liberty interest in movement outside of their cells.[222]

These cases are persuasive. Mr. Laird's allegations the modified movement restrictions prevented him from visiting certain areas of the prison and participating in certain activities are similar to the types of restrictions our colleagues found did not implicate a liberty interest. We find

there is no evidentiary basis on which a reasonable jury could find Mr. Laird's restrictions constituted an atypical and significant hardship compared to the ordinary incidents of prison life. We grant Superintendent Terra's Motion for summary judgment on Mr. Laird's due process claim arising from his modified movement status.

### 3. We grant summary judgment on Mr. Laird's equal protection claim arising from his modified movement restrictions.

Mr. Laird alleges his modified movement restrictions violated his rights to equal protection. To assert a protected class claim Mr. Laird must demonstrate he is a member of a protected class and Superintendent Terra treated similarly situated individuals outside of his protected class differently.[223] At the summary judgment stage he "must also provide evidence of intentional discrimination."[224] Because this claim arose in a prison setting, we require Mr. Laird to demonstrate "his treatment was not 'reasonably related to [any] legitimate penological interests.'"[225] As stated above Mr. Laird pleads his modified movement restrictions required a guard escort him around prison and limited his access to certain places and activities.[226] He alleges Superintendent Terra only applied these restrictions to capital prisoners, which was "discrimination."[227]

Superintendent Terra does not dispute his involvement with Mr. Laird's modified movement restrictions; nor does he dispute what the restrictions entailed. He argues he is entitled to summary judgment because Mr. Laird is not a member of a protected class and any "class of one" equal protection claim must fail because the modified movement restrictions applied to five capital incarcerated individuals.[228] He further argues there is no evidence he intended to use the modified movement restrictions in a discriminatory manner because the security threat to Mr. Laird remained even after Mr. Laird left solitary confinement.[229]

We agree with Superintendent Terra. Mr. Laird does not allege he is a member of a protected class on the basis of his race (white) or his religion (Catholic); he alleges he experienced discrimination because of his status as a capital case prisoner.  But capital case prisoners are not a suspect class under equal protection jurisprudence.[230] And the record contains no evidence demonstrating the modified movement restrictions constituted intentional discrimination. The evidence consists of Mr. Laird's filed requests and letters asking to be taken off the restrictions, a grievance Mr. Laird filed about an incident at Mass which occurred under the modified movement restrictions, a policy describing the restrictions, Mr. Laird's deposition testimony concerning the restrictions, and Superintendent Terra's declaration.[231] Superintendent Terra swore in his declaration he imposed the restrictions because Mr. Laird remained a security risk following his release from solitary confinement.[232] Mr. Laird does not point to any evidence rebutting the legitimate penological reason for the restrictions.

Without allegations of membership in a protected class or evidence of discrimination, Mr. Laird's equal protection claim must fail. We grant Superintendent Terra's Motion for summary judgment on this claim.

### 4.  We dismiss Mr. Laird's conditions of confinement claim arising from his modified movement status under section 1915(e)(2)(B)(ii).

Mr. Laird alleges his modified movement restrictions violated the Eighth Amendment. The Eighth Amendment 'prohibits any punishment which violates civilized standards and concepts of humanity and decency.'"[233] Prison officials must provide incarcerated persons with humane conditions of confinement.[234] "[W]hen the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety."[235] "To sufficiently allege prison officials violated his Eighth Amendment rights by imposing inhumane conditions," Mr. Laird must "allege facts showing (1)

the deprivation he endured was 'sufficiently serious,' and (2) the prison officials had 'a sufficiently culpable state of mind.'"[236] "[T]o withstand the government's motion for summary judgment, [Mr. Laird] must . . . raise[] genuine issues of material fact that the alleged deprivations were sufficiently serious and that the prison officials in question acted with deliberate indifference."[237]

Mr. Laird pleads the modified movement restrictions, which mandated a security escort and prevented him from visiting certain areas of the prison and participating in certain activities, constituted cruel and unusual punishment violating the Eighth Amendment. His deposition testimony supports his allegations.[238] As we noted above Superintendent Terra seemingly concedes his personal involvement in Mr. Laird's modified movement status and the resulting limitations. There is no genuine issue of material fact concerning the modified movement restrictions. Yet Superintendent Terra offers no argument why he is entitled to judgment as a matter of law. He argues for dismissal on the sole basis "there is simply no record evidence supporting an Eighth Amendment claim relating to the modified movement restrictions."[239] We again remind Superintendent Terra it is not our job to make legal arguments on behalf of the parties, "particularly at the summary judgment stage."[240]

But we still must screen this claim under section 1915(e)(2)(B)(ii). Mr. Laird's allegations concerning his mandatory off-unit escort and inability to participate in certain activities plainly do not rise to the level of cruel and unusual punishment contemplated in conditions of confinement jurisprudence. He does not allege these restrictions deprived him "of the minimal civilized measure of life's necessities . . . such as food, clothing, shelter, medical care, and reasonable safety."[241] We dismiss Mr. Laird's conditions of confinement claim arising from his modified movement restrictions.

### 5.   We dismiss Mr. Laird's claim alleging denial of his right to access the courts while on modified movement status.

Mr. Laird alleges his modified movement restrictions prevented him from accessing the main law library and conducting legal research in his civil and criminal cases.[242] The Facility officials do not move for summary judgment on Mr. Laird's claim he could not access the courts under modified movement restrictions. We typically would not decide the merits of these claims in the absence of a motion for summary judgment.[243] But our section 1915(e)(2)(B)(ii) obligations inform our analysis at all stages of litigation.[244]

To state a claim for denial of his right to access the courts Mr. Laird must allege the person who committed the conduct complained of acted under color of state law and deprived him of his right to access the courts.[245] He must also plead "actual injury, such as the loss or rejection of a legal claim."[246] Mr. Laird alleges his modified movement restrictions greatly restricted his access to legal research.[247] Without access to the main law library, Mr. Laird had to use outdated litigation manuals to litigate the present case, and his ability to make photocopies for legal filings was limited.[248] He alleges effective legal research "was all but impossible[,]" not only in the present case, but also in his capital case.[249] The modified movement restrictions prevented him from "aiding in his own defense" in "a matter of life and death."[250]

We sympathize with Mr. Laird's truncated access to the legal system but still must dismiss this claim. Mr. Laird does not allege his restricted access to the law library caused him to lose "the opportunity to pursue attacks of [his] conviction[] and civil rights claims."[251] He fails to state a claim for denial of right to access the courts absent these facts. We dismiss this claim.

**6.   We dismiss Mr. Laird's claims alleging violations of Pennsylvania's official oppression act and the federal Crime Victim Rights Act arising from his modified movement status under 1915(e)(2)(B)(ii).**

Mr. Laird also purports to state claims under Pennsylvania's official oppression act, a criminal statute, and the federal Crime Victim Rights Act, which does not contain a private cause of action, arising from his modified movement restrictions.[252] The Facility officials do not move for summary judgment on these claims, but we screen them under section 1915(e)(2)(B)(ii). Mr. Laird does not have a cause of action under either statute. We dismiss these claims for failure to state a claim.

## III.   Conclusion

We grant in part and deny in part the Facility officials' Motion for summary judgment on Mr. Laird's solitary confinement claims. As to Mr. Laird's Eighth Amendment claims we deny summary judgment on the general conditions of confinement claim, and grant in part and deny in part summary judgment on the inadequate medical care claim. We grant summary judgment on Mr. Laird's Fourteenth Amendment due process claim. The Facility officials do not move for summary judgment on Mr. Laird's First Amendment claim alleging denial of access to the courts or his claims under Pennsylvania's official oppression act and the federal Crime Victim Rights Act, but we dismiss these claims recognizing our section 1915(e)(2)(B)(ii) obligations.

We grant the Facility officials' Motion for summary judgment on Mr. Laird's modified movement claims and/or dismiss them. We grant the Facility officials' Motion for summary judgment on Mr. Laird's First Amendment freedom of religion claim. We grant summary judgment on Mr. Laird's Fourteenth Amendment due process and equal protection claims. Facility officials do not move for summary judgment on Mr. Laird's First Amendment claim alleging denial of access to the courts during his modified movement status. Nor do they seek summary judgment

on Mr. Laird's claims under Pennsylvania's official oppression act and the federal Crime Victim

Rights Act. But we dismiss these claims as lacking any support under the Law under section

1915(e)(2)(B)(ii).

---

[1] Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a Statement of Undisputed Material Facts ("SUMF") and an appendix to support summary judgment. Our Policies require parties opposing summary judgment to include a separate filing of statement of material facts responding to the numbered paragraphs in the movant's SUMF. Defendants Superintendent Terra and Deputy Superintendents Wynder and Hensley filed their Motion, SUMF, Memorandum in support of summary judgment, and Appendix at ECFs 44 and 45. Mr. Laird opposed the Motion and incorporated the parties' statement of undisputed facts from their joint Rule 26(f) report but did not file a statement of material facts responding to the numbered paragraphs of the Facility official Defendants' SUMF. "Any material fact not so disputed can be deemed undisputed for purposes of the summary judgment motion." *Oguguo v. Wells Fargo Bank*, No. 14-2383, 2016 WL 3041853, at *1 n.3 (D.N.J. May 27, 2016). But we are mindful Mr. Laird proceeds pro se and we may "relax procedural rules for an unrepresented litigant." *Id.* (citing *Tukes v. Hayman*, No. 10-0098, 2011 WL 915382, at *6 (D.N.J. Mar. 9, 2011)). "In these circumstances, [we] may draw relevant facts from the record, including a plaintiff's deposition testimony." *Id.* (citing *Jordan v. Allgroup Wheaton*, 218 F. Supp. 2d 643, 646 (D.N.J. 2002)).

[2] ECF 44 ¶ 2; ECF 53 at 21–22.

[3] ECF 44 ¶ 7; ECF 44-14 (Terra Decl.) ¶ 5.

[4] ECF 44-1 (Laird Dep.) 18:1–4; ECF 44-5 at 2.

[5] ECF 44-1 (Laird Dep.) 19:1–6.

[6] ECF 44-6. Only the existence of the tattoos is undisputed. The parties dispute when Mr. Laird got the tattoos. The Facility official Defendants, Superintendent Terra and Deputy Superintendents Wynder and Hensley, claim Mr. Laird's tattoo "was the primary reason Plaintiff was viewed as a security risk [and] assigned administrative custody status[.]" ECF 44 ¶ 10. But Mr. Laird argues he did not get the tattoos until after his stay in solitary confinement. ECF 53 at 7. And the photographs attached in support of Defendants' SUMF is unpersuasive as Mr. Laird does not appear to have his neck tattoo in the only dated photograph. *See* ECF 44-6. The photograph depicting Mr. Laird's tattoos are undated. *See id.*

[7] ECF 44 ¶ 11; ECF 44-1 (Laird Dep.) 30:5–9; 40:7–11; 41:3–5.

[8] ECF 44 ¶ 10; ECF 44-1 (Laird Dep.) 25:7–10; ECF 44-2.

[9] ECF 44 ¶ 11; ECF 44-2.

[10] ECF 53 at 21–22.

[11] ECF 44-2; ECF 53 at 6.

[12] ECF 44 ¶¶ 12–14; ECF 44-4.

[13] ECF 53 at 54–78.

[14] ECF 44-3 at 16.

[15] *Id.*

[16] *Id.*

[17] *Id.* at 17.

[18] *Id.* at 10–11.

[19] *Id.*

[20] The Facility officials' SUMF does not address most of the facts Mr. Laird alleges about his experience in solitary confinement. ECF 44. The Facility officials incorporate their SUMF into their Memorandum then proceed to discuss, as part of their legal analysis, facts which do not appear in their SUMF. ECF 45. Mr. Laird's opposition (ECF 53) does not include a separate statement of material facts but references many of the allegations raised in his operative Complaint (ECF 33). "The parties' papers, therefore, do not make it readily apparent which facts (whether or not deemed 'material') are disputed." *Williams v. Berks Cnty., Pa.*, No. 05-6303, 2006 WL 3827505, at *1 n.2 (E.D. Pa. Dec. 15, 2006). "In light of the summary judgment standard, we assume to be true, for purposes of this motion, the facts asserted by Plaintiff that have some support in the record." *Id.* "We do not purport to describe contrary facts as to issues for which Plaintiff presents sufficient evidence to defeat summary judgment." *Eichelman v. Lancaster Cnty.*, 510 F. Supp. 2d 377, 382 n.2 (E.D. Pa. 2007). "Obviously, at trial the jury will hear differing versions of events, will have an opportunity to judge the credibility of the source, and will be tasked with the responsibility of determining what probably occurred." *Id.*

[21] ECF 44-9; ECF 44-10.

[22] ECF 44-10 at 1–10.

[23] ECF 44 ¶ 19; ECF 44-8.

[24] ECF 44 ¶ 19.

[25] ECF 44 ¶ 20; ECF 44-9.

[26] *Id.*

[27] ECF 53 at 21–22.

[28] *See, e.g.*, ECF 33 at 2; ECF 53 at 6, 66–68.

[29] *See, e.g.*, ECF 33 at 8; ECF 53 at 9, 44.

[30] *See, e.g.*, ECF 33 at 2; ECF 53 at 8; ECF 44-1 (Laird Dep.) 25:4–5.

[31] *See, e.g.*, ECF 33 at 2; ECF 53 at 12; ECF 44-1 (Laird Dep.)  61:17.

[32] *See, e.g.*, ECF 33 at 2; ECF 53 at 8; ECF 44-1 (Laird Dep.) 25: 2–4.

[33] *See, e.g.*, ECF 33 at 2; ECF 53 at 8.

[34] *See, e.g.*, ECF 33 at 2; ECF 53 at 12; ECF 44-1 (Laird Dep.) 25:4–6.

[35] *See, e.g.*, ECF 33 at 2.

[36] *See, e.g., id.*; ECF 53 at 12.

[37] *See, e.g.*, ECF 33 at 2; ECF 53 at 12.

[38] *See, e.g.*, ECF 33 at 2; ECF 53 at 12; ECF 44-1 (Laird Dep.) 62:3–9.

[39] *See, e.g.*, ECF 33 at 9.

[40] *See, e.g., id.*; ECF 44-1 (Laird Dep.) 62:8.

[41] *See, e.g.*, ECF 33 at 9; ECF 53 at 12; ECF 44-1 (Laird Dep.) 62:12–17.

[42] *See, e.g.*, ECF 33 at 9 –10; ECF 53 at 8–9; ECF 44-1 (Laird Dep.) 61:8–14.

[43] *See, e.g.*, ECF 33 at 10; ECF 44-1 (Laird Dep.) 75:10–11.

[44] *See, e.g.*, ECF 33 at 3; ECF 53 at 12; ECF 44-1 (Laird Dep.) 66:13–20, 75:11–16.

[45] ECF 33 at 3.

[46] *See, e.g., id.*; ECF 53 at 9; ECF 44-1 (Laird Dep.) 65:21– 24; 66:1–12.

[47] *See, e.g.*, ECF 33 at 3; ECF 44-1 (Laird Dep.) 66:13–20.

[48] *See, e.g.*, ECF 33 at 10, 17, 24; ECF 44-1 (Laird Dep.) 63:12–13.

[49] *See, e.g.*, ECF 33 at 10; ECF 44-1 (Laird Dep.) 66:13–20.

[50] *See, e.g.*, ECF 33 at 10, ECF 44-1 (Laird Dep.) 73:16–24; 74:1– 21.

[51] ECF 44-1 (Laird Dep.) 74:22–24, 75:1–4.

[52] ECF 53 at 21–22.

[53] *Id.* at 33, 36; ECF 44 ¶ 21; ECF 44-14 ¶¶ 14–16.

[54] ECF 44 ¶ 23.

[55] ECF 53 at 33, 88; ECF 44-13 at 1.

[56] ECF 33 at 34.

[57] ECF 53 at 69–80; ECF 44 ¶ 24.

[58] ECF 2.

[59] ECF 24; ECF 32.

[60] ECF 31 at 22.

[61] *Id.* Non-party Jaime Sorber served as the Superintendent at SCI Phoenix when Mr. Laird's administrative custody status took effect. ECF 44 ¶ 13; ECF 44-1 (Laird Dep.) 29:1–4. Joseph Terra became Superintendent "shortly thereafter." ECF 44-1 (Laird Dep.) 29: 9–13. Joseph Terra served as the Deputy Superintendent for Centralized Services at the time Mr. Laird's administrative custody status began. ECF 44 ¶ 3; 44-14 ¶ 1. Nathan Wynder served as the Deputy Superintendent for Facilities Management. ECF 44 ¶ 4; 44-13 at 1. Charles Hensley is currently the Deputy Superintendent for Centralized Services but it is unclear what his title was when Mr. Laird's administrative custody status took effect. ECF 44 ¶ 5. Joseph Terra, Nathan Wynder, and Charles Hensley served as members of the Program Review Committee responsible for reviewing the status of incarcerated individuals in administrative custody. ECF 44-1 (Laird Dep.) 77:23–24, 78:1–14, 78:19–24, 79:1–8. It is undisputed Joseph Terra, Nathan Wynder, and Charles Hensley agreed with the decision to place Mr. Laird in solitary confinement and approved its continuation. ECF 45 at 8.

[62] ECF 31 at 22.

[63] *Id.*

[64] *Id.*

[65] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is "genuine" if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Servs.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)).  On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533–34 (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "If, after adequate time for discovery, the nonmoving party has not met its burden . . . the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex*, 477 U.S. at 322–23).

[66] ECF 53. Mr. Laird first asks us to dismiss the Facility officials' Motion because of a conflict of interest with their counsel. He argues there is a conflict of interest because Michelle Henry prosecuted Mr. Laird for first degree murder, is currently "prosecuting" Mr. Laird's federal habeas corpus petition and is representing the Facility officials in the present case in her role as Pennsylvania's Attorney General. *Id.* at 3. This role does not present a conflict of interest: Ms. Henry was or is representing the Commonwealth or Commonwealth employees in all relevant proceedings. Mr. Laird also seeks to renew his challenge to the materials the Facility officials produced in discovery. We already resolved this dispute in our Order (ECF 49) denying Mr. Laird's earlier Motion to compel discovery (ECF 46).

[67] "[A] a Complaint, including a pro se Complaint, must conform with requirements of Rule 8(a) of the Federal Rules of Civil Procedure" requiring "the Complaint be simple, concise, direct and set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *Atun El v. United States*, No. 13-3970, 2014 WL 1281230, at *1 (E.D. Pa. Mar. 31, 2014) (quoting *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993)). But our Supreme Court instructs us to hold pro se allegations "to less stringent standards than formal pleadings drafted by lawyers . . . ." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). "[B]ecause [Mr. Laird] has filed his complaint pro se, we must liberally construe his pleadings, and we will apply the applicable law, irrespective of whether the pro se litigant has mentioned it by name." *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003) (citing *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002)).

[68] ECF 33 at 1–25.

[69] *Id.* at 25–40.

[70] *Id.* at 4, 34; *see also Youst v. Roth*, No. 23-0848, 2023 WL 3821813, at *4 (E.D. Pa. June 5, 2023) (finding no cause of action under any of the criminal statutes cited, including 18 PA. STAT. AND CONSOL. STAT. § 5301 (official oppression)); 18 U.S.C. § 3771(d)(6) ("Nothing in this chapter shall be construed to authorize a cause of action for damages or to create, to enlarge, or to imply any duty or obligation to any victim or other person for the breach of which the United States or any of its officers or employees could be held liable in damages.").

[71] ECF 45 at 4–6. The Facility officials declare the Review Committee Members are no longer parties to this case because Mr. Laird has not identified or served them. *Id.* at 4 n.2. The Facility officials cannot unilaterally dismiss defendants from the case. But we agree Mr. Laird has effectively abandoned his claims against the unnamed Review Committee Members as the Facility officials produced documents identifying the members' names in discovery on June 4, 2024. *See* ECF 48 at 3, 4 (referencing ECF 44-8 and ECF 44-9). It does not appear ECFs 44-8 and 44-9 were among the handful of documents produced later, on July 30, 2024.

A plaintiff must serve a defendant within 90 days of filing the complaint. *See* Fed. R. Civ. P. 4(m). If Mr. Laird learned the identities of the Review Committee Members when he received the Facility officials' production on June 4, 2024, service was due on September 2, 2024. We recognize Mr. Laird did not receive the production the same day the Facility officials produced it given the slow mail in and out of prisons. Mr. Laird stated in a June 30, 2024 letter to the Facility officials' counsel the production "took quite a while to finally arrive." ECF 50 at 7. It is clear from the letter Mr. Laird received the production on or before June 30. Even assuming he did not receive the production until June 30, service would have been due on September 30, 2024. We may properly dismiss unnamed defendants for failure to serve. *See* Fed. R. Civ. P. 4(m); *Baumgardner v. Ebbert*, 535 F. App'x 72, 77 n.7 (3d Cir. 2013).

[72] *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

[73] *Rode*, 845 F.2d at 1207.

[74] *Id.*

[75] *McCoy v. Scott*, No. 23-21272, 2023 WL 7151361, at *2 (D.N.J. Oct. 31, 2023) (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003)).

[76] *See* ECF 44-14 ¶¶ 1 (providing Defendant Terra did not become Superintendent until October 16, 2022), 6 (providing Lieutenant Joliff submitted the 802 Report assigning Mr. Laird to administrative custody); ECF 44-4 (establishing then-Superintendent Sorber denied Mr. Laird's initial appeal of administrative custody status); ECF 44-1 (Laird Dep.) 30:5–15 (testifying Lieutenant Joliff told Mr. Laird about the threat requiring administrative custody), 31:10–19 (testifying the deputy in charge of security, other deputies, and the superintendent had a say in the decision and stating the deputy in charge of security at the time was Deputy Superintendent Bradley).

[77] ECF 53 at 7.

---

[78] *Tomino v. City of Bethlehem*, No. 08-06018, 2012 WL 398817, at *2 (E.D. Pa. Feb. 8, 2012).

[79] ECF 44-3. It appears the prison officials who ordered Mr. Laird's placement did not fully comply with their own policy requiring the 802 Report to detail "the relationship between the threat the inmate poses and the behaviors observed" and provide "a description of why alternatives to restrictive housing cannot safely mange the threat posed by the inmate." *Id.* at 10. The 802 Report submitted for Mr. Laird contained less than two lines of text stating Mr. Laird was in danger from some person in the facility without detailing the threat or describing why alternatives to solitary confinement were unavailable. *See* ECF 44-2. But this is immaterial given the lack of evidence the named Facility officials were involved.

[80] By contrast, Mr. Laird's earlier pleadings focused on the Facility officials' act of ordering him into solitary confinement and the length of his time there. *See* ECF 2; ECF 25.

[81] *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022) (quoting *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020)).

[82] *Id.* (alterations in original) (quoting *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2015)).

[83] *Tillman*, 221 F.3d at 418 (quoting *DeShaney v. Winnebago Co. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)).

[84] *Clark*, 55 F.4th at 179 (quoting *Tice*, 948 F.3d at 138).

[85] *Young v. Quinlan*, 960 F.2d 351, 361 (3d Cir. 1992)).

[86] *Caldwell v. Luzerne Cnty. Corr. Facility Mgmt. Emps.*, 732 F. Supp. 2d 458, 470, 471 (M.D. Pa. 2010) (first quoting *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir.1997); then quoting *Rhodes v. Chapman*, 452 U.S. 337, 362–63 (1981)).

[87] ECF 53 at 31–38; ECF 44-1 (Laird Dep.) 60:23–62:17; see *also Johnson v. Stempler*, No. 00-711, 2005 WL 119575, at *6 (E.D. Pa. Jan. 20, 2005) (denying summary judgment where part of the incarcerated plaintiff's evidence consisted of "affidavits from other inmates who experienced similar delays in receiving medical treatment"), *aff'd*, 373 Fed. Appx. 151 (3d Cir. 2010).

[88] ECF 45 12–13 (quoting *Rhodes*, 452 U.S. at 349).

[89] *Stone v. Trader Joe's Co.*, 186 F. Supp. 3d 395, 397 (E.D. Pa. 2016) (quoting *N.J. Carpenters Pension Fund v. Hous. Auth. & Urb. Dev. Agency of Atl. City*, 68 F. Supp. 3d 545, 549 (D.N.J. 2014)).

[90] *Id.* (alteration in original) (quoting *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006)).

---

[91] *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

[92] *Sampson v. Berks Cnty. Prison*, 171 F. App'x 382, 385 (3d Cir. 2006).

[93] *Wilson*, 501 U.S. at 303.

[94] *Id.* (citing *LaFaut v. Smith*, 834 F.2d 389, 39–92 (4th Cir. 1987)).

[95] *Tillery v. Owens*, 719 F. Supp. 1256, 1301 (W.D. Pa. 1989), *aff'd*, 907 F.2d 418 (3d Cir. 1990).

[96] *Id.* (citing *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979)), *aff'd*, 907 F.2d 418 (3d Cir. 1990).

[97] *See, e.g.*, ECF 33 at 3; ECF 53 at 12; ECF 44-1 (Laird Dep.) 66:13–20, 75:11–16.

[98] ECF 48 at 3 (noting production of medical records on June 4, 2024).

[99] ECF 45 at 14.

[100] ECF 44-1 (Laird Dep.) 74:22–24, 75:1–4.

[101] *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) ("The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." (citing *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994))).

[102] ECF 45 at 12 ("[Mr. Laird] never mentioned severe depression/stress, suicidal thoughts, or severe weight loss in connection with his appeal(s) – let alone attributing such medical conditions to one or more of the Defendants.").

[103] ECF 53 at 55 (request to Superintendent Terra), 83 (letter to Ms. Hydro).

[104] *Palakovic v. Wetzel*, 854 F.3d 209, 233 (3d Cir. 2017).

[105] 256 F.3d 120, 134 (3d Cir. 2001) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). Our Court of Appeals "has 'expressed uncertainty as to the viability and scope of supervisory liability' with respect to holding a supervisor indirectly liable for deficient policies or practices since [our] Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)" but it has held "in the context of an Eighth Amendment deliberate indifference claim, its test for supervisory liability has survived and is consistent with *Iqbal*." *Sarvey v. Wetzel*, No. 16-00157, 2019 WL 235322, at *4 n.9 (W.D. Pa. Jan. 16, 2019) (citing *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 319–20 (3d Cir. 2014)), *cert. granted, judgment rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015).

[106] ECF 44-3.

[107] ECF 44 ¶ 10; ECF 44-3 at 8.

[108] ECF 44-3 at 10–11 (emphasis added to last sentence). Though Mr. Laird does not identify this policy to support his supervisory liability claim, we are mindful Mr. Laird is a pro se litigant and we may draw relevant facts from the record. *See Oguguo*, 2016 WL 3041853, at *1 n.3 (citing *Jordan*, 218 F. Supp. 2d at 646), *aff'd sub nom. Jordan v. Wheaton*, 95 F. App'x 462 (3d Cir. 2004).

[109] ECF 44-3 at 10. The "asterisk" we refer to is actually footnote "9" in the policy but we substitute it with an asterisk to avoid confusion with our own footnotes and/or endnotes.

[110] ECF 44 ¶ 19.

[111] *See, e.g.*, ECF 33 at 8. We make no finding as to whether a B-Code Housing status indicates an incarcerated individual is mentally ill because the Facility officials do not address it.

[112] ECF 44-1 (Laird Dep.) 65:21–66:20; ECF 53 at 31–38.

[113] We note the record only shows Mr. Laird received one psychological assessment on October 25, 2022. ECF 44-8, ECF 44-9. Though the Facility officials assert Mr. Laird also received weekly counselor visits, ECF 44 ¶ 17, the record "evidence" they cite to is nothing more than the policy requiring weekly counselor visits for each incarcerated individual. *See* ECF 44-3 at 16. Nothing in the record suggests Mr. Laird actually received weekly counselor visits – or any counselor visits at all, for that matter.

[114] *Hampton v. Wetzel*, No. 15-898, 2019 WL 626423, at *4 (M.D. Pa. Feb. 14, 2019).

[115] *Williams v. Sec'y Pa. Dep't of Corrs.*, No. 22-2399, 2024 WL 4262139, at *10 (3d Cir. Sept. 20, 2024) (citing *Clark v. Coupe*, 55 F.4th 167, 179, 181–82, 184–85 (3d Cir. 2022)).

[116] *Id.* at *1.

[117] ECF 33 at 7, 13, 20.

[118] 854 F.3d 209 (3d Cir. 2017).

[119] *Id.* at 228.

[120] *Id.*

[121] *Id.* Though Mr. Laird does not provide supporting evidence, we note he, like Mr. Palakovic, alleges psychologists only spoke to individuals in solitary confinement through their cell doors. *See, e.g.*, ECF 33 at 3.

[122] *Palakovic*, 854 F.3d at 215.

[123] *Id.* at 228.

[124] *Id.* at 229.

[125] *Id.*

[126] We construe Mr. Laird's injury as exacerbated mental health issues following his time in solitary confinement as he alleges and testified about his ongoing mental health issues such as severe depression. ECF 33 at 10, 17, 24; ECF 44-1 (Laird Dep.) 63:12–13.

[127] *Beers-Capitol*, 256 F.3d at 136–37 (citing *Sample*, 885 F.2d at 1118).

[128] *Palakovic*, 854 F.3d at 226.

[129] *Id.*

[130] *Id.* at 228–29.

[131] *Id.* at 226.

[132] ECF 33 at 8, 14, 21.

[133] *Id.* at 8, 12, 18.

[134] ECF 53 at 86.
[135] ECF 33 at 8, 10, 15, 17, 22, 24.

[136] *Shoatz v. Wetzel*, No. 13-0657, 2014 WL 294988, at *5 (W.D. Pa. Jan. 27, 2014) (citing *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000)).

[137] *Allah v. Bartkowski*, 574 F. App'x 135, 139 (3d Cir. 2014) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

[138] *Id.*

[139] *Carter v. Beard*, 392 F. App'x 82, 84 (3d Cir. 2010) (citing *Shoats*, 213 F.3d at 145–47).

[140] ECF 31 at 18.

[141] Mr. Laird does not specify the type of due process claim he is bringing. *See* ECF No. 2. Mr. Laird's due process claims challenge the same conduct involved in his Eighth Amendment claim – his placement in solitary confinement. Our Court of Appeals instructs where an incarcerated person subjected to solitary confinement challenges their placement in solitary confinement by alleging an Eighth Amendment and a substantive due process claim we should dismiss the substantive due process claim under the "more-specific-provision" rule as the Eighth Amendment is the appropriate avenue to challenge conditions of confinement. *Johnson v. Pa. Dep't of Corrs.*, 846 F. App'x 123, 128 n.6 (3d Cir. 2021). We construe Mr. Laird's due process claim as a procedural due process claim.

[142] ECF 33 at 8–9, 15, 22.

[143] ECF 53 at 31–38.

[144] *Id.* at 54–78.

[145] We find it unnecessary to determine whether the second amended Complaint pleads a protected liberty interest with respect to Mr. Laird's time in solitary confinement because we can decide the due process claim as a matter of law without reaching that issue. *See Riley v. Taylor*, 277 F.3d 261, 311 (3d Cir. 2001) ("We need not address this question, however, because even if Riley has such a liberty interest, he has not shown any denial of due process."); *see also Austin v. Lehman*, 893 F. Supp. 448, 453 (E.D. Pa. 1995) ("[S]ummary judgment is appropriate here whether the asserted interest is characterized as a liberty interest or a property interest because Plaintiff has received all the process he was due."). "We are generally disinclined to reach beyond the issues that necessarily must be decided to dispose of a case . . . ." *United States v. Ladner*, 226 F. App'x 250, 253 (3d Cir. 2007).

[146] ECF 45 at 9 (arguing only Deputy Superintendent Wynder did not make any of the decisions to keep Mr. Laird in solitary confinement). But Superintendent Terra's Declaration, attached as an exhibit to the Facility officials' statement of undisputed facts contradicts the notion Deputy Superintendent Wynder was not involved. Indeed, Superintendent Terra swears Mr. Wynder was a member of the Review Committee that conducted Mr. Laird's first ninety-day review and decided he should remain in administrative custody. ECF 44-14 ¶ 11.

[147] ECF 45 at 9.

[148] *Id.*; ECF 44 ¶ 16.

[149] ECF 44 ¶ 16.

[150] ECF 44-10 at 1–3.

[151] *Id.* at 5.

[152] ECF 44 ¶¶ 12–14; ECF 44-4.

[153] ECF 44-8; ECF 44-9.

[154] ECF 44-10 at 1–10.

[155] *Moore v. Mann*, No. 13-2771, 2015 WL 3755045, at *6 (M.D. Pa. June 16, 2015) (quoting *Tarselli v. Harkleroad*, No. 10–1266, 2012 WL 603219 at *7 (W.D. Pa. Feb.23, 2012)).

[156] 213 F.3d 140 (3d Cir. 2000).

[157] *Shoats*, 213 F.3d at 144.

[158] *Id.* at 145 (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)); *see also Washington-El v. Beard*, 562 F. App'x 61, 63–64 (3d Cir. 2014) (holding incarcerated individual failed to demonstrate he was not afforded proper due process protections when he "was timely informed that he was placed in administrative custody . . . because he was considered an escape risk" and "his numerous challenges to his custody status, both formal and informal, were regularly reviewed by members of the Program Review Committee").

[159] *Shoats*, 213 F.3d at 146.

[160] *Id,*

[161] *Id.* at 145.

[162] *Id.*

[163] *Id.* at 145, 147.

[164] ECF 44-4 at 1, 2.

[165] ECF 44 ¶¶ 12–14; ECF 44-4.

[166] *Shoats*, 213 F.3d at 144 (quoting *Hewitt*, 459 U.S. at 476).

[167] ECF 44-8; ECF 44-9; ECF 44-10 at 1–10.

[168] ECF 53 at 9–10.

[169] ECF 44-8 at 1, ECF 44-9 at 1, ECF 44-10 at 3, 4, 5, 6; ECF 53 at 42, 43, 44, 45.

[170] *See, e.g.*, ECF 44-10 at 3 ("Initial AC hearing process explained"), 5 (noting Mr. Laird's request for property and his remark "I just want to be quiet and do my time."); ECF 44-9 (noting various requests by Mr. Laird).

[171] ECF 44-10 at 7, 9; ECF 53 at 46, 48.

[172] *See Bertolette v. Little*, No. 23-330, 2023 WL 9100642, at *5 (W.D. Pa. Oct. 26, 2023) (considering an incarcerated individual who received reviews of his administrative custody status every ninety days and had several chances to raise mental and physical health concerns but who alleged the reviews were perfunctory and concluding "failure to comply with prison policies or discuss certain issues does not amount to a denial of the required minimal due process" (citing *Shoats*, 213 F.3d at 147), *report and recommendation adopted*, No. 23-330, 2023 WL 8865873 (W.D. Pa. Dec. 22, 2023); *see also Washington-El*, 562 F. App'x at 64 (finding periodic reviews were not perfunctory where prison officials reviewed results of an investigation pertaining to Washington-El's escape plan, assessed whether to release Washington-El to general population, and responded to his arguments for release from administrative custody).

[173] ECF 44-11 at 1, ECF 44-12 at 1; *see also* ECF 53 at 54–68.

[174] *Id.*

[175] *Shoats*, 213 F.3d at 146.

[176] ECF 33 at 1–2.

[177] *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[178] *Banks v. Lappin*, No. 06-1127, 2009 WL 2486341, at *7 (M.D. Pa. Aug. 10, 2009); *see also Scott v. LTS Builders LLC*, No. 10-0581, 2012 WL 5207456, at *6 (M.D. Pa. Oct. 22, 2012) ("[W]e decline to decide whether Plaintiffs have a valid claim for the obvious reason that Defendants have not moved for summary judgment on the claim.").

[179] 28 U.S.C. § 1915(e)(2)(B)(ii).

[180] *Cash v. Wetzel*, 8 F. Supp. 3d 644, 658 (E.D. Pa. 2014) (citing *Muhammad v. Hilbert*, 906 F. Supp. 267, 270 (E.D. Pa. 1995)).

[181] *Id.* (quoting *Oliver v. Fauver*, 118 F.3d 175, 177 (3d Cir. 1997)).

[182] ECF 33 at 2.

[183] *Id.* at 4; *see also Youst*, 2023 WL 3821813, at *4 (finding no cause of action under any of the criminal statutes cited, including 18 PA. STAT. AND CONSOL. STAT. § 5301 (official oppression)); 18 U.S.C. § 3771(d)(6) ("Nothing in this chapter shall be construed to authorize a cause of action for damages or to create, to enlarge, or to imply any duty or obligation to any victim or other person for the breach of which the United States or any of its officers or employees could be held liable in damages.").

[184] 28 U.S.C. § 1915(e)(2)(B)(ii).

[185] ECF 33 at 33–35.

[186] *See Puricelli v. Houston*, No. 99-2982, 2000 WL 760522, at *14 (E.D. Pa. June 12, 2000) (due process, liberty, religious freedom and equal protection claims are subject to the same analysis under the Pennsylvania Constitution as those brought under their federal counterparts).

[187] ECF 33 at 34.

[188] *Ford v. Bureau of Prisons*, 570 F. App'x 246, 249 (3d Cir. 2014) (citing *O'Lone v. Shabazz*, 482 U.S. 342, 348–49 (1987)).

[189] *Id.* (citing *O'Lone*, 482 U.S. at 348).

[190] *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89, 107 (1987)).

[191] *Robinson v. Wetzel*, 648 F. App'x 168, 173 (3d Cir. 2016) (citing *Turner*, 482 U.S. at 89–90).

[192] ECF 44 ¶ 23.

[193] ECF 44-15 at 28.

[194] ECF 33 at 34.

[195] ECF 53 at 88.

[196] *Id.*

[197] ECF 44-1 at 85:2–24, 86:1–24, 87:1–8.

[198] ECF 33 at 34–35.

[199] ECF 45 at 15–16.

[200] 648 F. App'x 168 (3d Cir. 2016).

[201] *Id.* at 173.

[202] *See* ECF 44-14 ¶ 14.
[203] *See Robinson*, 648 F. App'x at 173 (upholding summary judgment where incarcerated individual could not view religious programming and Bible studies on television but had other alternatives); *Fraise v. Terhune*, 283 F.3d 506, 509–10 (3d Cir. 2002) (upholding prison policy which prevented incarcerated individuals from "engag[ing] in activities related to the group" but "did not foreclose all alternative avenues of practice" because the individuals could still "possess, study, and discuss the Bible and the Koran" and could seek "righteous living"); *Woods v. Chiarelli*, No. 07-0084, 2008 WL 3925835, at *3, *4 (M.D. Pa. Aug. 21, 2008) (concluding prison rule preventing incarcerated individual from attending communal prayer services did not violate his First Amendment rights under the Turner factors).

[204] ECF 33 at 37.

[205] *Shoatz*, No. 13-0657, 2014 WL 294988, at *5 (W.D. Pa. Jan. 27, 2014) (citing *Shoats*, 213 F.3d at 143).

[206] *Robinson v. Norwood*, No. 11-0631, 2013 WL 1413033, at *10 (M.D. Pa. Apr. 8, 2013) (first citing *Olim v. Wakinekona*, 461 U.S. 238, 247 (1983); then citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976); and then citing *Asquith v. Dep't of Corrs.*, 186 F.3d 407, 410 –11 (3d Cir. 1999)), *aff'd*, 535 F. App'x 81 (3d Cir. 2013).

[207] *Bartkowski*, 574 F. App'x at 139 (quoting *Sandin*, 515 U.S. at 484).

[208] ECF 33 at 33. It is unclear from the pleadings which restrictions form the basis of each of Mr. Laird's constitutional claims arising from his modified movement status. We read the "papers liberally and interpret[] them to raise the strongest arguments suggested therein." *Hodson v. Alpine Manor, Inc.*, 512 F. Supp. 2d 373, 384 (W.D. Pa. 2007) (citing *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[209] ECF 33 at 35.

[210] *Id.* at 33. To the extent Mr. Laird alleges the restrictions prevented him from practicing his religion or accessing the courts, we address these allegations elsewhere. *See supra* Section II(B)(1) (religion); *see infra* Section II(B)(5) (access to the courts).

[211] ECF 33 at 35.

[212] ECF 44-1 (Laird Dep.) 84:1–18.

[213] ECF 45 at 10.

[214] *See Morrison v. Rochlin*, No. 16-1417, 2020 WL 1543846, at *5 (M.D. Pa. Mar. 31, 2020) ("If no liberty interest is found to exist, it is unnecessary to define what process was mandated to protect it." (citing *Meekins v. Beard*, No. 06-290, 2008 WL 647738, at *4 (M.D. Pa. Mar. 5, 2008))).

[215] *See, e.g.*, *Klemka v. Nichols*, 943 F. Supp. 470, 474 (M.D. Pa. 1996) ("As a matter of general principle, courts are required to refrain from deciding constitutional issues not essential to the resolution of the case before them.").

[216] No. 09-1711, 2010 WL 1416837, at *3 (M.D. Pa. Apr. 6, 2010).

[217] *Alex v. Beard*, No. 09-1711, 2010 WL 1416837, at *3 (M.D. Pa. Apr. 6, 2010).

[218] 893 F.Supp. 448, 453 (E.D. Pa. 1995).

[219] No. 17-12086, 2018 WL 999676, at *3 (D.N.J. Feb. 20, 2018) (first citing *Watson v. Sec'y Pa. Dep't of Corrs.*, 567 F. App'x 75, 78 (3d Cir. 2014); then citing *James v. Quinlan*, 866 F.2d 627, 629–30 (3d Cir. 1989); and then citing *Johnson v. Burris*, 339 F. App'x 129, 130 (3d Cir. 2009)).

[220] *Lacour v. T. Duckworth*, No. 17- 00453, 2017 WL 3313702, at *8 (S.D. Ill. Aug. 3, 2017).

[221] *Id.*; *see also Thomas v. Ramos*, 130 F.3d 754, 762 n.8 (7th Cir. 1997).

[222] *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) (citing *Smith v. Shettle*, 946 F.2d 1250, 1252 (7th Cir. 1991)).

[223] *See Scavone v. Pa. State Police*, No. 09-1623, 2011 WL 6100621, at *3 (M.D. Pa. Dec. 7, 2011) (citing *D'Altilio v. Dover Twp.*, No. 06-1931, 2008 WL 3925833, at *3 (M.D. Pa. Aug. 21, 2008)), *aff'd*, 501 F. App'x 179 (3d Cir. 2012).

[224] *Love v. Does 1-9*, No. 17-1036, 2023 WL 4851064, at *6 (D.N.J. July 28, 2023) (first citing *Washington v. Davis*, 426 U.S. 229, 240 (1976); then citing *Robinson v. Superintendent Houtzdale SCI*, 693 F. App'x. 111, 118 (3d Cir. 2017)).

[225] *Holland v. Taylor*, 604 F. Supp. 2d 692, 701 (D. Del. 2009) (first quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005); then citing *Wilson v. Schillinger*, 761 F.2d 921, 929 (3d Cir. 1985)).

[226] ECF 33 at 33–34

[227] *Id.* at 34.

[228] ECF 45 at 10.

[229] *Id.*

[230] *See Riley v. Snyder*, 72 F. Supp. 2d 456 (D. Del. 1999) ("To the extent that Plaintiff's claim suggests that death row inmates confined in the maximum security unit are a suspect class, the Court finds no legal basis for such a conclusion." (citing *Rawls v. Sundquist*, 929 F. Supp. 284, 289 (M.D. Tenn. 1996)), *aff'd*, 113 F.3d 1235 (6th Cir. 1997); *see also Evans v. Thompson*, 881 F.2d 117, 121–22 (4th Cir. 1989) ("Because capital defendants are not a suspect class for equal protection purposes . . . legislative classifications must be presumed valid and sustained if they are 'rationally related to a legitimate state interest.'" (first citing *Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir. 1987); then quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985))).

[231] ECF 53 at 69–80; 88–92; ECF 44-13; ECF 44-1 (Laird Dep.) 83:11–24; 84:1–24; ECF 44-14.

[232] ECF 44-14 ¶ 14.

[233] *Clark*, 55 F.4th at 179 (quoting *Tice*, 948 F.3d at 138).

[234] *Id.* (alterations in original) (quoting *Martin*, 801 F.3d at 177).

[235] *Tillman*, 221 F.3d at 418 (quoting *DeShaney*, 489 U.S. at 199–200).

[236] *Clark*, 55 F.4th at 179 (quoting *Tice*, 948 F.3d at 138).

[237] *Young v. Quinlan*, 960 F.2d 351, 361 (3d Cir. 1992).

[238] ECF 44-1 (Laird Dep.) 84:1–18.

[239] ECF 45 at 13.

[240] *Coastal Outdoor Advert. Grp., LLC v. Twp. of Union, N.J.*, 676 F. Supp. 2d 337, 349 n.16 (D.N.J. 2009) (citing *Globespanvirata, Inc. v. Tex. Instruments, Inc.*, 2005 WL 3077915 (D.N.J.2005)), *aff'd sub nom. Coastal Outdoor Advert. Grp., L.L.C. v. Twp. of Union, N.J.*, 402 F. App'x 690 (3d Cir. 2010).

[241] *Tillman*, 221 F.3d at 418 (first quoting *Rhodes*, 452 U.S. at 337; then citing *DeShaney*, 489 U.S. at 199–200).

[242] ECF 33 at 33–34.

[243] *Banks*, 2009 WL 2486341, at *7; *see also LTS Builders*, 2012 WL 5207456, at *6 ("[W]e decline to decide whether Plaintiffs have a valid claim for the obvious reason that Defendants have not moved for summary judgment on the claim.").

[244] 28 U.S.C. § 1915(e)(2)(B)(ii).

[245] *Cash*, 8 F. Supp. 3d at 658 (citing *Muhammad*, 906 F. Supp. at 270).

[246] *Id.* (quoting *Oliver*, 118 F.3d at 177).

[247] ECF 33 at 33.

[248] *Id.*

[249] *Id.* at 33–34.

[250] *Id.* at 34.

[251] *Cf. Monroe v. Beard*, 536 F.3d 198, 206 (3d Cir. 2008).

[252] ECF 33 at 34; *see also Youst*, 2023 WL 3821813, at *4 (finding no cause of action under any of the criminal statutes cited, including 18 PA. STAT. AND CONSOL. STAT. § 5301 (official oppression)); 18 U.S.C. § 3771(d)(6) ("Nothing in this chapter shall be construed to authorize a cause of action for damages or to create, to enlarge, or to imply any duty or obligation to any victim or other person for the breach of which the United States or any of its officers or employees could be held liable in damages.").